Caldwell, Madonna and Craya. I believe appellants have each reserved a minute for rebuttal and they're each taking 4 minutes for their respective cases. It's my understanding Attorney Calhouse, how do you pronounce your name? Almost, Calhouse. Calhouse, my apologies. I believe that you are arguing first on behalf of Mr. Londonio, correct? That's correct. You may proceed. Thank you. Good afternoon. May it please the court, my name is Clara Calhouse. I represent Mr. Phil Londonio. The court should reverse Mr. Londonio's conviction for multiple reasons as he agrees, but primarily... I'm sorry, can I suggest that you go get closer to the microphone and to adjust it as you think appropriate. Is this better? Okay, I'll try it this way. So the court should reverse Mr. Londonio's conviction primarily because the district court's erroneous admission of co-defendant Terrence Caldwell's custodial interview without redaction of Mr. Londonio's name and without an appropriate limiting instruction instructing the jury at how it could consider the use of that statement with respect to Mr. Londonio violated Mr. Londonio's right to confront the witnesses against him in violation of the United States and its progeny. Now, in your briefing you suggested that we should wait to hear the SAMEA decision and if I'm mispronouncing, you'll excuse me. It has come out. How does that impact the arguments that you made? The SAMEA decision has indeed come out, and I think that it helps our argument. We cited it in our reply brief, and SAMEA basically says that a statement that directly inculpates a defendant and that is not admitted with a limiting instruction violates a defendant's right to confrontation. And if I may, that's exactly what happened here. I know the record in this case is voluminous, so if the court will permit me, I'd like to direct your attention to the interview transcript of Caldwell's custodial statement, which is at pages 1580 through 1596 of the defendant's appendix, and it was introduced through the testimony of New York Police Detective Sean O'Leary, whose direct examination is in the appendix at A1000 through 1008. In particular, I'd like to direct the court's attention to pages 1593 through 1596 of the interview transcript. That's where, after establishing that Mr. Caldwell knows Mr. Londonio by name, the detective then confronts Mr. Caldwell with cell site records, cell phone data, license plate reader data that effectively establishes the government's theory of the murder, and asks Mr. Caldwell, I'm trying to get an explanation for this. Mr. Caldwell says, I don't have one. But that's it. Mr. Caldwell doesn't say, well, Mr. Londonio's done all of this. He just, he gives explanations for some things, the government argues that he lies about some things, he's not fully honest about other things, but the statement, I thought the statement troubled you, was simply his response, I don't have one, which in no way says anything about your client. That's why I'm trying to understand the scrutiny aspect to it, please. I think the troubling part of, I don't have one, seen in context here, Your Honor, is that what the government then does with that statement, I don't have an explanation, in summation, is to argue that Mr. Caldwell has lied, and that the reason that he has lied is, and I'll quote from the government summation here at page A1427, the government says about Caldwell that when he sees the evidence, he lies about it. There is no innocent explanation because he is obviously guilty. And I think when you put that together with the fact that there was no limiting instruction to the jury about how it can consider this evidence with respect to Mr. Londonio, the prejudice is clear and overwhelming. Yeah, I have seven seconds, so I don't want to... Do you want to speak for just a moment about the attorney conflict issue, or do you believe the faculty has worked on your papers? I do believe that we've briefed it quite extensively. I think that what is important here is that the damage was done almost before it could be remedied by the government's withholding of the information about potential conflict with Mr. Carnese until just shortly before the trial. But your client had counsel well before the trial, other counsel, correct? Correct. There was learning counsel appointed as well. So it wasn't as if this was his only attorney, correct? That is correct. However, Mr. Carnese was his lead attorney, and we don't know, the record is not developed as to the relationship between Mr. Freeman and Mr. Ginsburg and Mr. Carnese or exactly the roles played by each, but as lead counsel, it's common practice that he would have taken the lead in stages of the case, including some negotiations, which are, of course, a critical part of the case, and the time for which had basically run by the time the information was disclosed, not to mention that Mr. Carnese had passed away. So, counsel, I know you only have four minutes. Each side had 20. If there's a, I'll give you a little bit of leeway, like a minute if there's something you wanted to tell us that you felt it was important to tell us with regard to your client that's not being covered perhaps by others. Thank you, Your Honor. I think in our brief we covered seven reasons that we believe that conviction should be reversed, and I would just note for the record, numbers six and seven, both are either have been decided by the Supreme Court, that's number seven, which was the question about the consecutive 924J sentence that was decided in our favor by Laura versus United States just this past June, I believe, and I'd like to point out, I know that our brief states, or it may have been a 28J letter, states that it's no longer mandatory to impose a consecutive life sentence. I note also that in the Laura case, the sentence imposed on the 924J was actually only five years, and the Supreme Court did not find fault with that. So, this case really should, no matter what else Your Honor's decide, this case should be remanded for resentencing so that district court can consider whether something less than life, and certainly something less than a consecutive life sentence is appropriate here. The other point on point six is that we had argued that Mr. Londonio's conviction on count seven, the 924J count, should be vacated because by car murder was not a crime of violence sufficient to serve as a predicate, and I will note that this court's pastore decision is currently before the solicitor general has agreed that cert is appropriate. That's in Delegati versus United States, and so I would just ask the court to reserve decision until we see what happens. But to issue six on your client, doesn't Stone versus United States foreclose that argument? Currently, yes, Your Honor. However, in light of the fact that the solicitor general just on open. But wouldn't that be holding it open until next term? It's possible. And the... Thank you. You reserve one minute for rebuttal. Yes, thank you. Good afternoon, and Attorney Brian Jacobs? Yes, good afternoon. Good afternoon, and you are doing oral argument on behalf of Mr. Terrence Caldwell, correct? Yes, Your Honor. You may proceed. Thank you, Your Honor. May it please the court, Brian Jacobs. I represent appellant Terrence Caldwell here on appeal. I didn't represent him below. This court should reverse Mr. Caldwell's convictions in their entirety because the evidence of trial was totally insufficient to prove that Mr. Caldwell was a member of the La Casa Nostra enterprise, that he murdered Michael Meldish to maintain or increase his position in the enterprise, or that he attempted to murder Enzo Stagno to maintain or increase his own, Mr. Caldwell's own, or Michael Meldish's position in the enterprise. This court has reversed or vacated convictions in past cases where murders were purely mercenary, where the defendant was not a member of the enterprise, and this case falls squarely within those precedents. Well, what about the fact that you're arguing sufficiency of the evidence? What about the fact that there's video of your client driving or riding in Mr. Meldish's vehicle the day, at the time he shot, or shortly around the time he shot Mr. Londonio driving to that location? There certainly was evidence. There was cell site location evidence. There was, I'm not sure precisely which... DNA evidence, correct? Correct. So that evidence is all of the Meldish murder, which is the second murder here. There was a total absence of any evidence that Mr. Caldwell's commission of that murder was to maintain or increase his position in the enterprise. So putting aside... How about maintain his position in the enterprise as an associate? He has no position in the enterprise. The word associate is a word the government has used, but in terms of what the evidence at trial showed, the government's evidence that he was an associate was primarily that he committed that murder and that he committed the prior shooting. And this court's precedent is very clear that just participating in a murder is not sufficient. But if there's evidence that someone is routinely engaged in the activities of the racketeering organization, and it's in essence their claim as the hitman, why are they not a participant in the... So you have to look at the murders, or the murder and the shooting individually. In connection with the initial shooting, the position there was there's no evidence at all that that was to maintain or increase Mr. Caldwell's position in the enterprise, or that he was... Would you concede that there was evidence to suggest that the Meldish murder was for furtherance of the goal of the enterprise itself? Not as to Mr. Caldwell. If he had been hired, for example. No, I'm not asking as to Mr. Caldwell. I'm asking, do you concede that there was evidence that the jury heard that the murder of Mr. Meldish was for the purpose of furthering the activity of the Lucchese family and the debt owed by Mr. Meldish to the Lucchese family? So the question of maintain or increase position, it's a question of intent. And so it's a question of Mr. Caldwell's intent. If Your Honor's question is, was there evidence that somebody else had the intent to maintain or increase that person's position in the enterprise by being involved in the Meldish murder, I'm not sure. I'm not prepared to concede that, but I'm not sure. But certainly, as to Mr. Caldwell, there was a total absence of any evidence whatsoever that it was to maintain or increase his position in the enterprise, as opposed to, for example, to commit a murder for hire, or because he had had a falling out with his friend. I understand your point about not increasing his position in the organization, but I'm struggling with why it wouldn't maintain his position in the organization, that being what the government claims it was, which was to be the hitman. I apologize, Your Honor. Because he had no position in the enterprise, he was not a member of the family. He was not a hitman for the family. The initial diagnose— No, he wasn't a member and he couldn't be a member because he wasn't Italian, but he really did appear to be a fellow trapper, given the folks with whom he was engaging in conduct and the folks on whose behalf he engaged in conduct. So I don't think it was impossible for the government to argue at trial that the reason he was with Mr. Londanio that night was because they were going to off Mr. Meldish for some reason related to the enterprise. I appreciate what you're saying. You're saying he can't be a member of the Lucchese crime family, I might even agree with you, but I don't think it forecloses him from being associated with the enterprise, Eureka, versus to you. It doesn't foreclose it, Your Honor, but there would need to be some evidence from which the jury could permissibly draw that inference. And there simply is not that evidence here. This case falls squarely on the side of the line within this court's precedent of the Frampton case, where this court said that the friendship that existed there, which is similar to the friendship between Mr. Londanio and Mr. Caldwell, the friendship there, that was too attenuated a basis to say that the so-called hitman in that case shared the intent of his friend. And here, just because Mr. Caldwell was friends with Mr. Londanio, and just because he rode around in a car with him at one point many years earlier, that does not, standing alone, establish that he, Mr. Caldwell, sought to maintain or increase his position in the enterprise. When you look at this court's cases, the Arrington case or the Vernacci case, which I'm sure I'm mispronouncing, that the government relies upon, there was simply a lot more evidence in those cases that the defendants involved were members of the enterprise, you know, sold drugs or participated in music videos or participated in public displays to show off the enterprise's strength. There was none of that here. There was some forensic evidence connecting Mr. Caldwell to the scene of the Meldish murder and the Stagno shooting. There was no evidence at all that this was… Well, there was evidence in the form of statements that you believe were improperly admitted. The evidence was simply that he was the shooter. It was not that he was seeking to maintain or increase his position in the enterprise. And on that piece of evidence, of course, we would ask in the alternative that this court vacate the conviction, order a new trial, because that was essential evidence. It was a statement, a hearsay statement, that Mr. Caldwell was the shooter. It was tremendously prejudicial, and it came in as a statement against interest, but it was not part of any jointly… The statement at issue was not one reflective of jointly undertaken activity, as in the Miller case, for which Judge Vailo was on the panel. I see my time is far up. I'm happy to answer any other questions or otherwise rest on our papers. I do not. Thank you, counsel. You do reserve your one minute, everybody. I believe, and I may mispronounce the name, but is it Attorney Joshua Gertaut? Gertaut. How are you, Your Honor? Thank you. And I believe that you will be speaking, arguing for the defendant, Matthew Madonna. That's correct, Your Honor. You may proceed. Everyone can hear me? Mr. Madonna is not challenging the RICO conviction. The government introduced two prior guilty pleas of Mr. Madonna with respect to racketeering-oriented offenses, gambling and other offenses, in New York and New Jersey state courts. So we're not challenging the RICO. This appeal, Mr. Madonna's appeal, is about those counts are based essentially on one statement on a recording by Joseph Tatella, who claims more than a year after the murder tells an informant that Mr. Madonna ordered it, essentially. That's it. That's the only thing directly linking Mr. Madonna with this homicide. And there's no source for that piece of hearsay. We don't know how many layers. It's, again, more than a year after the homicide's committed. As a matter of fact, all the hearsay in this case that comes in could be from the same unreliable source, because the hearsay that we challenge, none of it has a source, has a specific source. And there's nothing, there's no detail in Mr. Tatella's statement, and it doesn't pass the reliability test. To say there's no detail, and I looked at the transcript, I believe it was Exhibit 702-ATR, the transcript of that August 18th recording of a conversation between Joe Tatella, Robert Spinelli, and the undercover agent. And I read Judge Seibel's decision, and in looking at the content of the conversation, I'm trying to understand, I think I understand your argument. Your argument is this is some drug deal, has nothing to do with the enterprise or the enterprise. And I'm struggling to find out why it doesn't. Because Tatella appears to be saying, look, I brought this guy Richard in, he turned, he became a rat. We owed $200,000. I owe these guys $200,000. And this is what happens when you owe the money, when you borrow, you know, when you work for the enterprise and you don't pay the debt back. How is that not in furtherance of? We're not making that argument. We're making the argument twofold. One is that this hearsay is not sourced. It's not reliable. There is no conspiracy between Mr. Madonna and Mr. Tatella with respect to the murder. Also, there's no need, I'll get into the other part in a minute, but I want to talk about Giganti for a moment, because that's really the link. Well, I thought that's the argument you were relying on, Giganti. Yes, this is part of it though, because it's about membership in the enterprise and not a conspiracy. And that's exactly what Giganti is about. And to permit this simply because the government charges... So you are arguing, as I understood you to be arguing, that Tatella's with another main member or soldier of the organization about why he needed to enter into this drug deal, drugs for cigarettes, untaxed cigarettes, was that he needed to come up with $50,000 to pay $25,000 to Maddie, your client, and $25,000 to CREA because he owed the partner who became a government witness, their money was frozen, he owed the money. And I thought he brought up, it seems to me from the transcript, he's saying, look, there's this guy, he had this guy clipped, and he's the one who brings up the name, not Spinelli. So when you say there's no about that Maddie had Meldish clipped because Meldish owed him money and he wasn't paying him back and he owed him money and he told Meldish, basically, you collect it. That's not the murder. But that's not the murder. And that's not ordering it. It's just not the murder. There's no detail about when you look at the government's cases, all the cases, and we deal with that at pages 9 through 11 of our reply. All of those are sourced from direct participants in the acts or from declarants who spoke directly to participants. There's no detail here about the murder itself. It takes it totally out of the realm of the kinds of cases, besides which, it doesn't matter that it's part of the larger enterprise because that's what Giganti is about. It can't just be activity. It has to be related to what's... Right, but didn't Judge Seibel say, look, the conspiracy, in order to let the statement in as a co-conspirator statement, the conspiracy, the evidence of the conspiracy that must exist is one between the declarant, in this case Botello, and the defendant, Madonna. And she looks at the statement and says, there's enough information here that he's describing a debt he owes to them from the family business. Why isn't that enough? Because it's not a conspiracy that has anything to do with the murder. That has to be... And the order is something that... And Botello also had an extraordinary ulterior motive. Well, I think they all came together in the context of why the statement should not have come in. And I think in the context of Giganti, being a member of this larger enterprise does not do it. Russo says the same thing. Romanello says the same thing. That's a disreportion. It's not that he's a member of just this reputation. It's that, like Melvish, he owes a debt that's involved through loan sharking, and that he, being a named member of the organization, and Melvish both work for the organization, both owe the family money. But that's not the conspiracy that we're talking about here in terms of the murder. That would be entirely... Again, Giganti is about... There has to be a precise conspiracy that puts that statement to be a co-conspirator statement. And the ulterior motive... I understand your position, as I understand, that just because you're a member of the bomb, you can't then, or any organization for that matter, you can't just make any statement about any crime of any person in the organization. It has to be a statement that's in furtherance of the organization. That's not what Giganti says. It has to be a conspiracy, precise conspiracy, not the organization itself. It doesn't have to be in furtherance of the organization. That's not a conspiracy. That's an enterprise. They're two separate concepts. And the ulterior motive that the Tello has reinforces all of that, because it's really not about that. It's about him trying to enlist Spinelli with this claim of... He held this money for decades, never paid it. He paid whatever he paid. But the point is, he was never threatened. There's an acknowledgment in the records that he was never threatened. This is something he made up to entice Spinelli to help him in these lucrative deals. But this is what they thought. And he met up to the jury to decide whether he made this up or not. But he does say, he does express concern that Mattie, your client, is telling Crea that he's not good for the money. I think it goes to the gatekeeping function of the judge. And that's the whole problem, because by letting this in, we've unraveled all of the protections against the evils of hearsay. And if I may, Your Honor, because I'm way over now, but if I could just discuss the Pinkerton point. If I may go ahead and move to the Pinkerton point, Your Honor? Yes, yes. Okay, thank you. And again, it's just because a court can charge Pinkerton as an alternative theory doesn't mean it should. The court has to exercise discretion. It's not an exercise of discretion to say, well, I can, so I will. It has to look at the specific application in this case, which makes the Pinkerton instruction invalid for a number of reasons. And it's not just that there's a lack of evidence that there's anything other than a direct order to commit this homicide. There's no evidence that would support a Pinkerton theory from the government, but also it's irreconcilable with the government's theory. Because the government's theory is there was a direct order, and Pinkerton is a question of foreseeability. The government's theory had to be a direct order because you can't have a murder without a direct order from the boss. The person for whom an unsanctioned murder would be least foreseeable is the boss. It couldn't be foreseeable. It's incompatible with the direct order because that's the way the organization works. And then on the other hand, you have Pinkerton, which is based solely on foreseeable. But there was evidence in trial of sneak murders or sneak assaults, things that were done. And I'm not saying that it doesn't exist in tension with what the government was arguing, but I mean, for you to say least foreseeable, somebody had to know it could happen. No, no, but that's not a basis for a liability for a life without parole sentence that requires specific intent and knowledge. Can it be? Is it possible? No, the boss operates, according to the government, the boss operates on the presumption. That is, orders will be followed. Sneak murders, to the extent that they're foreseeable, will be punished by death. So these are, the boss does not foresee that someone is going to violate the rules. Hasn't the circuit decided that you can have both a Pinkerton liability and a direct order at the same time? Not a direct order. It's cases in which... Those cases are not order cases. Those cases is the 924C case that I think Judge Cabranes was on the panel. There's another case in which there's room, there's no room here for that. Think about preparing for a trial and trying a case, thinking about preparing for trial for over two years, trying a case on a single hearing by the government, that there was a direct order from Mr. Madonna, and then at the end of it all, the government gets to say, well, that has to order it at all. He's a boss, so he's liable. That's not fair. There are boundaries, and that's what the exercise of discretion is all about, these boundaries. What about Escobar, second circuit case 2012? There was, this court rejected the argument that you're making, which is that you can't have Pinkerton liability, and... I'm not saying that. I'm not saying you can't. I'm not saying you can't. I'm saying in this case, given the extraordinary circumstances and the specific irreconcilability of the government's theory with that Pinkerton theory, because it couldn't be foreseeable to a boss, I'm saying the court abuses its discretion in delivering that instruction. I'm not saying in that case, in the abstract where it's appropriate, where there's a weighing and there's a possibility. There's no possibility here that this could have been an appropriate theory for the government. And I just want to point out two other things, because the government mentioned in his brief with respect to Pinkerton, is that with respect to constructive amendment, and government cited a couple of cases where it was, that the court said, well, there was a aiding and abetting charge. So there was vicarious liability, and I know Judge Cabranes was on one of jury. Aiding and abetting requires, number one, a consummated crime. Here's a conspiracy in Pinkerton. Aiding and abetting requires an act by the defendant and specific intent. Pinkerton has none of that. Pinkerton is about foreseeability. You can't have an aiding and abetting instruction of the grand jury that encompasses the elements of Pinkerton. They, too, are in direct tension with each other. So that doesn't do it. And the fact that the dispositive in any respect, because at that point, what are we supposed to say? There's no evidence. If the evidence had come in in some way that would accommodate a Pinkerton instruction, we wouldn't have an objection to that true trial. But after the evidence has all come in, and we're at a true charge conference that we're giving a charge to the jury, there's no basis for this instruction. Thank you. Thank you. Attorney White? Brendan White? Good afternoon. Yes, and I'm accompanied by co-counsel, Anthony DiPietro, in this case. Okay. And you are here arguing on behalf of Mr. Stephen Crea, correct? That's correct, Your Honor. May it please the Court. The case against Mr. Crea was never strong, particularly with regard to the Meldish homicide. There was no evidence that Mr. Crea knew Meldish or had any involvement with him whatsoever, and certainly no motive to want to see him killed. The prosecution's theory was simply that Crea was necessarily involved in it because of his purported position in the charged enterprise as the underboss. And as a result, the government acknowledged at trial that they had no evidence of any cooperating witness having spoken to Mr. Crea within the past 20 years or so. They had no intercepted communications with Mr. Crea. They had to rely on hearsay evidence. If we were to conclude that the audio recording and transcript of the conversation between Spinelli di Tello and the undercover agent were properly admitted, wouldn't that evidence implicate your client in the Meldish murder? It's not direct evidence. Mr. Dre Tell very adequately made the point that this was, for all intents and purposes, gossip. I do want to... Isn't that for the jury to determine? In terms of the sufficiency of the evidence, we have to draw all inferences in favor of... Just to make clear, Your Honor, I'm not making a sufficiency of the evidence argument. That was preface. I apologize. What I am arguing is that... I thought that's what you were arguing. Yes, I apologize for not being clear enough about that. What I am arguing is that Mr. Evangelista's testimony, which was admitted as a statement against penal interest, was improperly admitted on every single basis. The declarant, Mr. Londonia, was, in fact, available. Yes, he was, in fact, available. Well, he was available. He let it be known mid-trial that he would testify if... What was there? There were several conditions that I didn't think we would... I didn't think that Judge Seibel knew until the middle of trial that he was available. That circumstance was forced by the government's action and the court's decision to reverse its earlier decision. The court had correctly decided pre-trial that Evangelista's statements, quoting Londonia, were not trustworthy. Well, some of them came in. Your concern was the reversal of the district court's decision referencing the father and son statements. Yes, of course. Yes, okay. Before trial, Judge Seibel was willing to let in certain of the statements made to Evangelista. Was that not correct? Some of the statements, but the important one, with respect to my client, it was the key question regarding the father and the son. Judge recognized Mr. Evangelista gave a version of facts that could not have occurred, and then when that was pointed out to him, he carefully tailored his account to try to deal with that, having been proven, obviously, to be a liar about that. Sir, my concern is simply with your opening point about the availability. I'm not sure that you could say that he was available when we're in the middle of trial. I am concerned about a decision that suggests to a district court that if a co-defendant at a trial suddenly says, oh wait, I'll testify mid-trial that the district court is somehow obligated to stop the trial to that defendant and let them go second. It's an understandable concern, Your Honor, but these are unusual circumstances. The government moved mid-trial to ask the court to change its ruling. Both defendants, I would imagine, I can only speak on behalf of Mr. Cray, but I would have to assume Mr. Londonio as well, relied on the court's pre-trial ruling. But that happens, right? Trials are fluid. Sometimes the court says at the beginning of the trial, hey, you know, I don't think this evidence, there's enough of a foundation, I don't think this piece of evidence comes in, and then the judge lets in Titello's reporting. That's what made the judge change Judge Seibel, then say, you know, now that Titello's statement, I find, comes in, because it is a co-conspirator statement in furtherance of the conspiracy of the reciprocal organization, specifically this sharking family business. She then lets in Evangelista's statement based on that. And I thought her finding as to unavailability was she found that Londonio's statement that he was going to be available if he was tried first, if this case was done with, she said that that was not credible, because he undoubtedly would assert the Fifth Amendment. And that she found that his statement that he would be available, one, was conditioned on his trial, I guess, going either, I thought, second or first. First, I thought. But then she also said he probably would have asserted the Fifth Amendment. It's hard for me to imagine that Mr. Londonio would not have a Fifth Amendment right, even if he had been convicted or had been acquitted and tried first, because the defendant who takes the stand and says, you know, I didn't say that, that's a lie, is also subjecting himself or herself to perjury charges. So I don't know that his Fifth Amendment right would go away, would it? Hypothetically speaking, sure, but here we don't even really have to ask that question, because Mr. Londonio stated in a signed statement, provided, you know, by the way, at the earliest time it could reasonably have been done, when the judge suddenly changed course and everybody realized evidence is coming in that the defense did not reasonably understand to be coming in. And he stated, I would not wait, I would not invoke my Fifth Amendment privilege. When the trial court finds that that statement is not credible, what are we to do as an appellate? I think your honors have to look at the fact that in addition to Mr. Londonio's statement, this statement was also signed by Mr. Londonio's counsel, an officer of the court. Yeah, but a counsel can't make a defendant make that call. A defendant can walk up to the stand, very willing to testify, and then get on the stand and change his or her mind. Under any circumstances, it was the responsibility of the court in having changed its course halfway through, and you know, for reasons we discussed, you know, amply in our brief, the judge was were willing to go to trial together. The case was weak, particularly against Clare. Then it comes back to the Tellos statement. There was the Tellos statement. To the extent that gossip, third-party gossip, and a cooperating witness's interpretation of that carries much weight. I mean, I personally don't think it does. I don't think the jury would have the government relied so heavily on, first of all, why they fought so hard mid-trial to ask the judge to change its mind after the defense had relied in their opening statement, in formulating their trial strategy, on the fact that that was not coming in. And second, there was also the testimony of the organized crime expert, Special Agent Carrillo, who, as I understand, the government's papers in response to our bail motion, the government is now backtracking off of that and recognizing that Special Agent Carrillo's testimony really was not as accurate as they relied on at the time. And as a result, Evangelista's testimony was crucial. The government relied on it in the summation. The jury asked for it. They asked for all his testimony with respect to Londonio. This was critical. And going back again, there was no evidence directly implicating Mr. Crea in the Veldish murder. It was strictly gossip and the word of this jailhouse informant that should never have been let in. Thank you, Your Honor. Thank you. Again, you've reserved one minute. Thank you. Is the attorney's name Hagen Scotton? Yes, Your Honor. Last name is Scotton. Thank you, Your Honor. As Your Honor just said, my name is Hagen Scotton. I'm an assistant U.S. attorney in the Southern District of New York. I represent the government here and I also represented the government in the district court. May it please the court, absent direction from the court, I'm just going to sort of go in the order that the appellate's claims came up. With respect to Londonio, on the Caldwell statement that he didn't have an explanation, Your Honor's questions are exactly correct. It wasn't offered for its truth. I should be clear, the district court did instruct the jury that it was not being offered for its truth. It was an instruction explaining that the government was using this statement to prove Caldwell's guilty state of mind by arguing that he had made false statements in interview. And so the district court did say this is not being offered for its truth. It is also the case, however, that this court has squarely held that where you don't offer statements for its truth, there's no root in problem and therefore no need for limiting instruction. I think the Logan case is sort of clearest on that, where the government offered what it believed was a false alibi. It showed that a conspirator had given a false alibi in a post-arrest type environment, and that was offered against all the defendants in that case because the fact of the alibi's falsity and the fact that this false alibi was shared by the other co-conspirators tended to prove the conspiracy. So the idea that this was inappropriate is just squarely against precedent. In fact, this court said in Stewart that the defendant there didn't have the temerity to suggest you couldn't offer false statements because of the confrontation clause because it was so clear that you can. With respect to the conflict issue, I should just note the district court found no conflict, which renders the later questions about timing essentially irrelevant. We also think the court's questions were correct on that, but it doesn't matter. There was no conflict here. But the only concern I have is with respect to Mr. Carnegie's argument. I thought the government's argument about it was a little bit circular insofar as what was said is that Mr. Londonio's unwillingness to cooperate foreclosed the possibility that Mr. Carnegie had discouraged or would have discouraged us from cooperating. But I was wondering if that was sort of putting because I think the point is, do we know, can we say with certainty what Mr. Londonio would have done had Mr. Carnegie not been present? I'm not sure it's enough to say the fact that he didn't show that he wouldn't have, because I thought that's what the defense was saying, that had Mr. Carnegie not been present in the relationship earlier in time, had he been discharged earlier, then perhaps Mr. Londonio might have, in the trial or in the prosecution, might have differed. So I think the answer to that is, Your Honor, here we do have a clearer picture than usual because Mr. Londonio actually put on the record that he had no interest in cooperating. But Your Honor is, of course, correct. You can't unwind the clock. One can imagine almost anything. And to the extent the court doesn't want to cross that bridge, I think the easier way to deal with that issue is the district court also found that the fact that Carnese represented Londonio and Mayorino separately, and that was the alleged source of this conflict about cooperation, was public. And it was. It was widely known. Mr. Carnese appeared at bail hearings for both of them. It was covered in the press that covers organized crime cases. And Judge Seibel, and I believe this is at page 923 of the appendix, it's very clear, everybody knew this. So the idea that Londonio's attorneys could only learn that Carnese also represented Mayorino by reading witness notes of Londonio telling that to a government witness was simply absurd. So to the extent this was ever a conflict, it was fully on everyone's radar for the entire time. And so it was nothing that needed to be resolved at a hearing about it. And I should also note- And the government didn't move for a cursio hearing. We didn't move for a cursio hearing. Why not? Well, it's not in the record, Your Honor. And when Judge Seibel suggested- I don't want you to- Well, I should say this. When Judge Seibel said, you know, essentially, I wish you had brought this to my attention earlier, we said we do too. I will say as a To ask for that hearing, we would have had to state our basis. To state our basis, we would have had to essentially reveal that Evangelista was a witness, because it was a conversation presumably Londonio had only with him. And the dangers of revealing witnesses before trial are obvious. And I don't mean that he necessarily would have been killed, but Mr. Evangelista was subject to great harassment once his identity as a witness came out. And so there being no conflict here, and look, ultimately, Judge Seibel agreed with us on the merits. We erred on one side. Judge Seibel wished he had been involved sooner. But in the end, there's really no reason to question her ultimate rulings. Very quickly, because I think Mr. Londonio only raised them quickly, the Laura issue is entirely dealt with by cases of this court, such as Alcacer, which is to say where you have a consecutive life sentence to another life sentence under the concurrent sentence doctrine, although here it's consecutive. It's irrelevant. We're not saying there isn't an error. If this court were, for some reason, or in the future, the other sentences were to be unfettered, then, as this court said in Alcacer, he could raise a Laura claim. And there's simply no reason to consider it now, because it can't shorten his actual time in prison. And then finally- Even if it can't shorten his time in prison, shouldn't the record adequately reflect what the sentence ought to be? I mean, are there things, privileges within the prison that he may or may not have access to? Do you see what I mean? I understand that question, Your Honor, and I've seen it raised before. But what I will say is, here, there's a whole other murder conviction. Assuming this court doesn't unsettle the 1959 A1 murder conviction, I'm not aware of any case on which a defendant's treatment in prison is at all changed by how many murder convictions he has. And Mr. Londonio has a murder conviction. And of course, the Laura sentence is still a murder conviction, right? The 924G count, 924J count, is still valid here. It's just a question of how much more time he should get on it. And I should be clear, it's not on a lawful sentence. And Judge Seibel had the authority to impose exactly- Had discretion, just not mandatory. Right. So I think the only thing to be done would be, if the whole sentencing package were later disturbed, I think, you know, then Mr. Londonio and, in fact, all the defendants, because they all have the same issue in their sentence, could say, look, reconsider the whole sentence. Please think about whether you really want to give me a consecutive life sentence now that I've been sentenced. I would note that the court probably doesn't need to hold for Delegati that the Solicitor General acquiesced to cert in that case because the Third Circuit does not apparently believe that attempted murder is a crime of violence. That's what it says in the paperwork there. There's no reason to think the Supreme Court is going to say, not only is attempted murder not a crime of violence, murder isn't either. I hope that is implausible. I'm going to move on to Mr. Caldwell's arguments, add some further questions on Londonio. With respect to Mr. Caldwell, I suppose I should start with this. Judge Seibel is correct that legally it doesn't matter whether or not he was a member. The defendants in Vernacci were associates. And in a case called Brady, this court specifically rejected the argument that organized crime associates are not members for purposes of the racketeering statute, which makes sense. You wouldn't let organized crime control who could be subject to racketeering laws. And so just as in Vernacci, where there was also no direct evidence of racketeering motive, the jury was more than entitled to infer Mr. Caldwell's racketeering motive. If I can, I'd like to walk briefly through the span of evidence, which the court's questions alluded to some of them. In 2011, Mr. Caldwell is riding around in a van with Londonio and Mellish, Lucchese associates, looking to assault members of the rival Bonanno family, so very much organized crime activities. Caldwell disappears from the scene for a little while, but that's only because he's in prison. So there's no inference you could draw from that that he somehow absented himself from the mob. When he shows up in 2013 and shoots Enzo Stagno in a premeditated assassination attempt, he is in communication all the time on that day with Mellish and Londonio. And again, I don't think there's any dispute that the overall context of that crime is organized crime. There's no other motive for it. And then so when he commits the third act of violence, which there is more than sufficient evidence to show, was in fact an order murder by the boss of the family, as Judge Kahn alluded to. From those three things, the fact that he keeps performing acts of the hitman, and we haven't just said muscle for the mob, more than supported inference. That is far, far stronger than the Frampton case on which Mr. Caldwell's relying on. I really want to stress how weak the evidence was in Frampton. In Frampton, the racketeering enterprise was in upstate New York. It consisted of three men selling crack cocaine in the building. The murderer lived in the Bronx. He had no connection to that area, to that enterprise, et cetera. In order for him to commit the murder, they had to send a car down to the Bronx to get him, bringing up to some area near Albany, have him kill the person, then put him in a car to go back to the Bronx. And the only evidence in that case from which a racketeering motive could be inferred was the fact that he was friends with the person who hired him. And the government said, well, they're friends. Surely they talked about it. This court said that was speculative. But where you have three racketeering acts over two years in regular communication with two Lucchese associates, and there's no other apparent motive for those acts, there was more than sufficient evidence for the jury to infer both his status as an associate and his motive to maintain both his own status and the status of all the people on whose behalf he committed the murders. I suppose I'm going to do David Evangeliste's statement later because pre-argued against briefly. I think I'm on track and hopefully I'll get to all the issues. On Madonna, I think what we have is a challenge to admissibility of the Ditello statements. To the extent that Madonna is arguing they weren't reliable, that's not an assessment this court makes under Borgelli and Maldonado-Rivera. If 801b2e is satisfied, there is not an independent reliability analysis. So it's just a question of whether the co-conspirator statement's exception was satisfied. And that's where I ask your counsel a lot of questions because I understood their argument to say that pursuant to Giugandi, this cannot be a co-conspirator statement because, and I understood part of the argument, at least the argument below before Judge Seibel and somewhat here, that because Ditello was trying to broker a deal with the undercover agent and Cinelli, another main member of the organization, to sell drugs in exchange for untaxed cigarettes and cash in order to pay Maddie, Madonna, and Crea, who paid the family for the dead yoke, that because he was trying to broker this deal, somehow it's not a co-conspirator statement because they weren't part of the conspiracy to sell drugs and get money. And I understood Judge Seibel to say, look, the conspiracy you have to look that exists is whether there's a conspiracy between the declarant, Ditello, and the defense, in this case, whether it's Mr. Madonna or Mr. Crea. In other words, that they have an ongoing conspiracy as part of being members of this organization and whether those statements were made in furtherance of that. And so I ask your opponent a lot of questions about that. Can you explain why you believe the court got it right in terms of letting him escape? Absolutely, Your Honor. So to start, Your Honor's characterization of Gigante was more accurate than Mr. Madonna's. Your Honor is absolutely right. What it says, and it literally uses these words, is that mere membership in organized crime will not suffice. So Your Honor is exactly, that's what it holds. It says you can't just say, well, you're all in a mob, therefore they're all co-conspirator statements. It does not say in any way that being members of the same charged racketeering conspiracy does not suffice. It doesn't say that there, but to the extent there is any ambiguity in Rousseau and even more forcefully in Coppola, this court said exactly that. It addressed Gigante. It said what Gigante is about. There's really no room left for this argument. Coppola is particularly on point because in Coppola, there were two conspiracies. There was a sort of narrow conspiracy, which I think had to do with corrupting a particular labor union. And then there was the conspiracy to operate the affairs of the Genovese family by a pattern of racketeering activity. And this court said, it's unclear whether the statements came in in furtherance of the smaller conspiracy, but they were plainly statements in further of the broader conspiracy to operate the Genovese family. That is exactly what you have here. You have a Lucchese family conspiracy and not a vague, oh, it's in the mob. It's got a lot of predicates. You can find an indictment. You can look exactly at the charge. And there is neither precedent or logic behind the idea that you can use any statute in the world to admit a statement as furtherance of a conspiracy, except racketeering conspiracy. There is zero support for that notion. And here, so with that case law background, your Honor is correct about Judge Sabel's specific reasoning. She said, look, here they're trying to do a deal, which is unquestionably aimed at paying money to the family. I should say Spinelli was not a main member. Spinelli was also a long-time associate in the family. The teller was allegedly a main member. Yeah, I don't think there's any dispute that he was a main member. But what about this argument that somehow this was a private debt and not really a debt to the family? Some kind of private debt either to Crea or to Crea, because he mentions Crea. He also mentions Matt in the, at least in the transcript. I don't recall that the defendant's developing that argument very well, but just to be clear, you know, there was evidence. Richard testified at trial. It wasn't just the teller describing this, that this debt came very directly out of family business, out of construction rackets in the late 90s and very beginning of 2000. That the teller and Richard were partners. With Crea, the three of them, they're really working at Crea's behest. Richard becomes a witness. The teller and Crea go to jail. Crea blames the teller for bringing Richard in, and this debt ensues. And so it came from family business. It was also being paid as family business. Among other things, we played a tape of the teller's captain, Dominic Truscello, telling him he had to go up to the Lucchese headquarters in the Bronx to pay Crea. He had to get up there and pay. And in fact, it was a charged predicate. The extortion of Joseph DiTello was one of the predicates that the jury was charged on. So the government's position, when DiTello says, look, they're going to blame me for bringing Richard in. So I took over Richard's debt, and I told them, I'm worth more alive than dead. I'll take on his debt, and I'll pay you. That was to pay Crea and Mattie? That was the government's position? Yeah, I'm not sure we quite as much detail on the origin of the debt, other than DiTello assumed it as a result of the early 2000s debacle. But yes, it really was to pay Crea. Now, Madonna, as the boss, may have gotten some of that then kicked up to him. But the collection of the debt, and I think Judge Seibel reasonably relied on this, was very much family business. In the recording, the same recording where they talk about killing Melvish, DiTello recounts how Madonna is telling Crea that he on DiTello to collect this. He says, he's making a jerk out of us, and he's making a fool out of you. As in, you're letting the subordinate get away with not paying you, he's breaking the rules, he's making the hierarchy look weak. And I think Judge Seibel was absolutely correct to rely on that, and a lot of other evidence in saying, essentially, look, this statement about Melvish being killed furthered the enterprise because it said that if you don't pay your debts, if you don't pay your debts, you're going to be in debt forever. And that's a very classic statement in furtherance. I don't take there to be a dispute that if the defense agreement of neoliberal premises, that is a statement in furtherance. Could we, could you speak, please, about the Pinkerton issues of Memorandum Part 2 of the appellants here? It does seem to be a bit of a departure from the chain of command theory that the governments have been arguing throughout the trial. I appreciate what you're saying, which is that you let them know in advance that it was presumably with the requested charges, but I'd like to understand here, counsel from Subodai, that the government's theory was such, and the evidence was such, that it wasn't appropriate to suddenly add a Pinkerton theory. Tell me why they're wrong. Well, I think for reasons implicit in your Honor's question, they're certainly wrong about to the extent, whether it was ultimately correct or not, they certainly were on notice of it. In terms of the Pinkerton instruction, frankly, it was more valuable against Mr. Crea, who didn't sit at the very top, and so wouldn't necessarily have had to give an order. And if you look at the government's argument, that's really where we focused on Pinkerton. Sure, but you didn't say, absolutely, with respect to Mr. Crea, we were doing, you know, you can look at this other way. You suggested Pinkerton for all. Absolutely. And I'm pretty sure we mentioned Mr. Madonna in arguments, too. I think one easy way to do this, though, is to cut through the foreseeability knot. Mr. Dreytel says, well, it wasn't foreseeable in furtherance of the rapturing conspiracy, because the boss would have to order murder. Well, the problem for him is that Mr. Madonna was also convicted of a conspiracy to murder Michael Melnick. That's the whole issue right there, as this court noted in Gershwin, where you're convicted of a conspiracy, the literal object of which is the substance of crime. It is, of course, foreseeable that the substance of crime would ensue. So, and that makes a lot of sense here, right? Madonna conspired with others to murder Melnick. He is therefore unhooked for the fact that he was, in fact, murdered in furtherance of that conspiracy to murder Melnick. I'm happy to discuss the broader issues, if it was only hooked on a racketeering conspiracy, but the fact that it wasn't sort of renders them somewhat irrelevant. I can spin out a hypothetical where it matters. For example, if the jury had gone off of David Evangelista's testimony, more so than the Vitello recording, in which it says that what Evangelista says was that Melnick was killed because he disrespected the boss. He didn't literally say that the boss ordered it. Now, you can imagine a rapture conspiracy where someone disrespects the boss, and everybody says, you know, we have to kill him. Of course, Maddie would approve of this. He's disrespecting him. Of course, the boss wants us to kill this guy. So, we're not going to get formal approval. We're just going to do it. Had that happened, the boss would be liable. In furtherance of the overall conspiracy, it meets the Pinkerton elements. Do I think that's likely what happened here? No, I think the jury likely convicted him on a direct evidence theory, but that would only tend to show the Pinkerton instruction was harmless, right? If Madonna's submission is, the Pinkerton instruction did nothing. Now, I have to start putting myself in the mind of the jurors. Sure, but if you think about it this way, if the whole submission is there's no evidence to submit a Pinkerton theory, to support a Pinkerton theory, all the evidence supports a direct liability theory, and the jury convicted him, the defense has just told you that the Pinkerton thing was beside the point because there's no evidence. I don't think it was an error for the reason I just explained, but given that he was convicted of a conspiracy to murder Mel, this is also simply irrelevant. And then, I think that leaves Crea's arguments, which are about the Evangelista statements, or really just about the Evangelista statements. In terms of availability, the court is correct. Londonio was unavailable because he was a defendant at the trial. This court said in Dupree to establish one person's unavailability. It simply said, Brian, as a defendant, was an unavailable declarant because he did not testify at trial. That's all the court felt it needed to say to establish a lack of availability. It is true that mid-trial, and really towards the end of trial, Londonio made a conditional offer to testify. That still doesn't make him available. As Your Honor pointed out, it was conditioned upon a severance that hadn't occurred. He was still saying, and in fact, he literally said at age 1267, I'm not going to testify at this trial. What I'm telling you is I'll testify in the future. So he was certainly unavailable for the trial that actually occurred. In terms of the questions about, well, could he have been available at another trial, there's a doctrine for that. It's the Finkelstein factors. It gets to Judge Bail's concern with these mid-trial or late-trial requests to sever so that now one defendant can testify to the other. Mr. White didn't really actually get into the Finkelstein factors, but Judge Seibel did in great detail. I'm happy to walk through them, but I think the bottom line is she carefully considered each factor. She found three out of four to weigh against severance and one to weigh only slightly in favor of severance. And her decision is reviewable with extreme discretion. This court has described it as must show a miscarriage of justice, and the decision is virtually unreviewable. That's under Stewart and Usick. And given that Priya hasn't even pointed out an error in her consideration of the Finkelstein factors, it's certainly within her raw discretion. I think it is probably worth briefly addressing the merits, the 804b3, the statement against penal interest ruling, although I'm happy not to. I see I'm two minutes past my time. I didn't want to go down this road, but since you started the walk, I mean, I was wondering if there was a point, if there could be a point where the comparative culpability between the declarant and the person against who he's mentioning in the statement is just so stark that the penal interest exception would not apply. I guess your argument would be, look, as long as it's a statement against the declarant's penal interest and the declarant's available, and there's indicia of trustworthiness, the comparative culpability doesn't matter in the absence of minimization? I mean, there's a suggestion here that there's minimization. Do you think minimization doesn't matter? I think minimization absolutely does matter, and one can imagine a case where the incredibly low degree of culpability that the declarant assigned to himself might indicate minimization. But here, of course, all the evidence, and I think some of this mass amount of evidence that Londonio was, in fact, the driver of the murder, so we can't expect him to lie about his role. We can't ask him to exaggerate it so that he's not minimizing. That wouldn't make sense. And where there isn't minimization, where all the evidence is that the declarant is accurately describing his role, no, there's no you're not very guilty exception, and I can give you a case for it, Your Honor. Dupree. In Dupree, one of the statements this court admitted was the declarant's statement that the defendant robbed me, assaulted me, and stole my drugs. And the court said that that's a statement against penal interest because you admitted you had drugs. In that statement, clearly we know who the bad actor is. It's the defendant, but it's still a statement against penal interest. So I think Creston resolves Your Honor's question. I have some further questions. Thank you. Thank you. Counsel, you have one minute for rebuttal. If you wish to go in a different order, that's fine, as long as you've worked it out. But you each have a minute for rebuttal. Take your time. I can relate. Thank you. Thank you, Your Honor. I will try to be as quick as is coherent. I know I don't have much time. First of all, with the government's argument that the statement was not often for its truth, I think it's very important to look at what actually happened here. And as I said, in summation, the government relied on the statement not just to say that Caldwell was lying, but actually that he was lying because he was, in fact, guilty. That's again in page A1427 of the transcript. The government says, when he sees the evidence, he lies about it. There is no innocent explanation because he is obviously guilty. And the limiting instruction that was given on this point is at pages 1505 through 1506 in our appendix. And that instruction is only as to Caldwell. There is no instruction about how the jury can consider the entire statement with respect to Ms. Rondonio. And I would note also at 656 in our appendix, the district court was concerned about this possibility. 656. The district court was concerned about this possibility pre-trial. And I think that what she feared actually came to pass, even though she tried her best by precluding the true statement, it still turned out that the statement was used as evidence of guilt and against Ms. Rondonio. But there's a difference, excuse me, between saying that a statement is not being admitted for its truth and saying that we want to consider it could be evidence of guilt, right? All right, I'll let you go on. Thank you. That's correct. But I think what happened here was both, really. With respect to the conflict issue, the point really here is that Rondonio is not a lawyer. And even though the fact that Mayorvino was represented also by Mr. Carnese may have been on the public docket, nobody took the time to tell Mr. Rondonio, hey, here's what this means for you. Here's what you should know about potentially having a conflicted attorney. And the government's decision not to raise the issue, I think, is concerning, especially when the government did raise multiple other crucial claims in the course of the trial. As far as the concern... Government alluded in their argument that Mr. Rondonio affirmatively said he was not going to cooperate anyway. Do you agree with that? I was not counseled to Mr. Rondonio in the district court. But even if he was not to cooperate, he still could have pled guilty, for example, without cooperation. And we don't know, we just don't know if he had been properly counseled about the potential conflict. We don't know what the outcome would have been and what decision he might have made. As far as the question about letting the name of the cooperating witness be known, I would say they could have redacted that. That would be no problem. Sure, because you never would have figured out who they were. I just think it's not... When we're faced with a violation of someone's And with respect to the Laura issue and the 924-J sentence, I will note the district court said that it was tragic that she said Rondonio was going to be spending so much time, his entire lifetime, in jail and that she thought that she did not have discretion to impose anything other than life sentence. That's on page 60 of our opening brief when she says the term of imprisonment on count seven must be imposed consecutively to any other count. And she should be given the chance to reconsider that. I think that's it. Thank you. Thank you. Thank you. Attorney Jacob. Thank you, Your Honor. Bear with me one moment. Thank you, Your Honor. So just briefly in response to Judge Fela's question about relative culpability in a statement against penal interest, I think what's troubling here is that Mr. Rondonio's statement is one where he doesn't think he's culpable at all. He says he had nothing to do with it. He was just a driver. And indeed, a driver could well have no culpability if, for example, a driver picked someone up after a crime took place. And the evidence here was that it was driving away from the murder, not to the murder, as in the Miller case. And so I think here, the relative culpability question is he doesn't think he's culpable at all. It's not a statement against penal interest. On the sufficiency question, in marshalling the evidence against Mr. Caldwell, Mr. Scotton pointed out that Mr. Caldwell drove in a van in 2011 to assault Bananos, shot Stagno in 2013, and then shot Meldish after that, and then said no other motive made sense. He said it twice. No other motive made sense. The government's burden is to offer evidence from which the jury can infer a proper basis for a conviction. Saying no other motive made sense not once but twice in the argument is indicative of the weakness of the government's proof here. What were you arguing? That it was merely fortuitous that he just ended up being in the car or being with Lucchese Associates for each of these episodes of violence? The evidence doesn't say anything in either way. He could be. So they're allowed to make, they're allowed to ask the jury to draw those inferences, yes? You're just suggesting the inferences are not adequately supported under this court's precedent. There is no case the government points to where the evidence of intent, of maintaining or increasing position in the enterprise was as weak as it is here. They pointed to the Vernacci case. There this court wrote that a reasonable jury could have concluded that Vernacci went so far as to commit murder in a crowded bar because such a public display related to preserving and even enhancing the reputation of the crime family and its members and there Vernacci in fact got promoted afterwards whereas here of course Meldish got killed after the shooting because he was acting against the family. That case is far stronger proof that it was in furtherance of the enterprise. Absent any questions we'll rest on our papers. Thank you. Thank you, Your Honor. I neglected to mention before that co-counsel Andrew Patel is here as well. We tried the case together. I want to read from Giganti in response to the government's claim about what Giganti says and what Russo says. I'm quoting at page 83 of the opinion. This is not to say there could never be a conspiracy comprising many different Mafia families. However, it must be a conspiracy with some specific criminal goal in addition to the general conspiracy to be a member to be members of the Mafia. And from Russo which is 302 F 3rd 37 at page 44 this court said the point of the observation in Giganti was that a declaring statement made in furtherance of a criminal act a murder in that case in Giganti a murder in that case is not admissible against the defendant under the co-conspirator exception unless the defendant was associated with the declarant in a conspiracy or joint venture having that criminal act as its objective an association between the defendant and the declarant in some other venture and in particular a general association between them in the Mafia will not suffice that is what we have here and to permit this you might as well just erase Giganti and erase Russo because they have no meaning if the enterprise is somehow the furtherance issue as opposed to a specific conspiracy because the enterprise is not a conspiracy and charging it as a conspiracy should not be permitted as an end run around the protection that the surestay rules provide to defendants to give them a fair trial. If I may just on the Pinkerton with respect to the government's argument about the conspiracy conviction in Escobar itself this court pointed out that that that one of the problems with Pinkerton is that there could be a conspiracy rebound and that the the nature of criminal conduct that's alleged in the course of a case can let the jury infer that from the Pinkerton instructions there actually is a conspiracy and here in a organized crime case in which Mr. Madonna is supposed to be the boss that rebound effect is very present and very dangerous. Thank you your honors just with respect to the Finkelstein factors that were mentioned by Mr. Scott and I do want to in the interest of saving the court time to direct the court's attention to pages 37 through 40 of our brief in which we do discuss the Finkelstein factors and point out why the judge was incorrect with respect to each of them including of course the question of judicial economy which we continue to maintain was principally should be left at the feet of the government who made this mid-trial motion but in any event Mr. Lemdonio did in fact state unlike in several other cases like Miller he stated that he would waive his fifth amendment privilege that was not true in other cases where defendants where decorum stated that they would not waive their privilege so we submit that Finkelstein was in fact satisfied here I do also want to point out that Judge Seibel was aware of Mr. Dottaro's statements prior to trial this was not something it's true of course the trial is a fluid thing but Judge Seibel was aware of that prior to trial and the government finally had to be aware of Special Agent Carrillo's testimony at the time at least it was considered a cornerstone of the government's case he was the government's expert witness it's impossible to imagine that that's something that happened during the fluidity of an ongoing trial the government was well aware of what his testimony was going to be prior thank you your honor thank you counsel I believe that concludes well argued counsel thank you for your time and your patience as we went well over time but I take it no objections from either side thank you and the court will be adjourned